JOHN A. PERRINE, COMPLAINANT, v. THE CHESAPEAKE AND DELAWARE CANAL COMPANY, DEFENDANTS.

The Chesapeake and Delaware Canal Company have no right under their charter to demand toll from passengers who pass through the canal, or from vessels on account of the passengers on board.

The articles upon which the company is authorized to take toll are particularly enumerated, and the amount specified. The toll is imposed on commodities on board of a vessel passing through the canal.

No toll is given on the vessels themselves, except only when they have no commodities on board, or not sufficient to yield a toll of four dollars. Passengers are not mentioned in the enumeration, nor is any toll given upon a vessel on account of the persons or passengers it may have on board.

A corporation created by statute is a mere creature of the law, and can exercise no powers except those which the law confers upon it. The canal company is not the absolute owner of the works, but holds the property only for the purposes for which it was created. It has not, therefore, the same unlimited control over it which an individual has over his property.

Nor has the company a right to refuse permission for passengers to pass through the canal. On the contrary, any one has a right to navigate the canal for the transportation of passengers with passenger boats, without paying any toll on the passengers on board, upon his paying or offering to pay the toll prescribed of law upon the commodities on board, or the toll prescribed by law on a vessel or boat when it is empty of commodities.

THIS cause came up from the Circuit Court of the United States for Delaware, on a certificate of division in opinion between the judges thereof.

It involved the construction of the ninth and eleventh sections of the charter granted by Maryland, the provisions of which are similar to those of the charter granted by Delaware.

"SEC. 9. For and in consideration of the expenses the said stockholders will be at, not only in cutting the said canal and other works for opening the said navigation, but in maintaining and keeping the same in repair, the said canal and works, with all their profits, under the limitations aforesaid, shall be, and the same, are hereby, vested in the said corporation for ever, and it shall and may be lawful for the said president and directors, after the said canal shall be made navigable, to demand and receive the following tolls . . . . . every pipe of wine or French brandy containing . . . . . 'one dollar and twenty-five cents,' . . . . . [&c., enumerating articles and specifying the tolls,] and for all other commodities the same proportion, agreeable to the articles herein enumerated; and every boat or vessel which has not commodities on board to pay the sum of four dollars shall pay so much as, with the commodities on board, will yield the sum aforesaid, and every empty boat or vessel four dollars, except an empty boat or vessel returning, whose load has already paid the tolls affixed, in which case she shall pass toll-free."

" Sec. 11. The said canal and works to be erected thereon by virtue of this act, when completed, shall for ever thereafter be esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities, or produce whatsoever, on payment of the toll imposed by this act, and no tax whatsoever for the use of the water . of the said canal, or the works thereon erected, shall at any time hereafter be imposed by all or either of the said States."

The following correspondence explains the origin of the dispute.

### (*Exhibit No. 1.*)

To the President and Directors of the Chesapeake and Delaware Canal Co., Philadelphia.

*Princeton, N. J., 24th March, 1847.*

Gentlemen, — As I propose to establish a canal passenger line of boats between Camden, Philadelphia, and Baltimore, to pass through your canal, I think proper to give you notice of my intention so to do. My plan is to commence running on the 1st day of May next, to be continued .through the spring and summer. I have been informed that the company of which you constitute the Board of President and Directors claim the right to prevent the transit of passengers through the said canal, if you deem it expedient so to do ; and that if you permit it, you still maintain the right to charge a toll for each passenger, whom you allow to pass through. Now, being of opinion that neither by your charter, nor by law, are you authorized either to exclude passengers, or to charge a toll on them, I beg to inquire whether any such right or authority is claimed or will be insisted on by you, so as to prevent future misunderstanding, and I shall be obliged by an answer at your earliest convenience.

Very respectfully, your obedient servant,
(Signed,)            J. A. Perrine.
To Caleb Newbold, Esq.,
     *Pres't Ches. and Del. Canal Co., Philadelphia.*

### (*Exhibit No. 2.*)

{ *Chesapeake and Delaware Canal Office,*
{    *Philadelphia, 30th March, 1847.*

At a meeting of the Board of President and Directors of the Chesapeake and Delaware Canal Company, held this day, the President laid before the board a letter dated 24th instant, from John A. Perrine, Esq., of New Jersey, stating his intention to

15 *

establish a canal passenger line between Camden, Philadelphia, and Baltimore, and making inquiry as to the transportation of passengers through the canal, and a charge of tolls therefor.

The said letter was read and considered, and it was resolved, That the President reply to Mr. Perrine, and inform him that the company claims the right to exclude passengers unless their transit is allowed by the special permission of the company, and, if that is granted, then to receive a fair rate of toll for each passenger.

Extracts from the minutes.

PETER V. LESLEY, *Sec.*

(*Exhibit No. 3.*)

To JOHN A. PERRINE, ESQ., Princeton, New Jersey.

{ *Chesapeake and Delaware Canal Office,*
  *Philadelphia, 30th March,* 1847.

SIR: — Your letter of the 24th instant, addressed to the President and Directors of the Chesapeake and Delaware Canal Co., has been received, and was laid before the board. A resolution was passed by them, of which I inclose you a copy. The company regard the canal as a "public highway, free for the transportation of all goods, commodities, or produce whatsoever," on payment of the tolls "authorized by charter, and for boats or vessels which have not commodities on board," on payment of the sum authorized in such case by charter; but they deny that it is a public highway for the transportation of passengers, and claim the right to exclude passengers, except by special permission of the company; and if that is granted, then to receive a fair rate of toll for each passenger. The canal was intended by the charter to be used by vessels engaged in commerce, not by passenger lines, which interfere with the trade and injure the canal. Any vessel you may send in the line you propose to establish will be permitted to pass through, if they have goods, commodities, and produce on board; or, if empty, on payment of the regular tolls now imposed. If you carry passengers, or persons not engaged in the navigation or business of the vessel or cargo, you will be required to pay one dollar toll for each passenger, on arriving at the first lock. If you refuse to make this payment, or to land your passengers, the vessel will not be permitted to pass through the canal. I am directed also to say, that, if your vessels pass through the canal, they will be required to adhere strictly to all the existing rules and regulations as to speed and conduct. Very respectfully, your obedient servant,

(Signed,)      C. NEWBOLD, JR., *President.*

Perrine *v.* Chesapeake and Delaware Canal Co.

### (*Exhibit No. 4.*)

To the President and Directors of the Chesapeake and Delaware Canal Company.

*Princeton, New Jersey, April 1st, 1847.*

GENTLEMEN : — I have received the letter of your President, dated the 30th of March. After due reflection, I have in reply to say, that I do not consider the Chesapeake and Delaware Canal Company as being authorized by law, either to exclude passengers from my vessels, or to charge me any other toll than the sum they are authorized by the charter to receive for an empty vessel. This I will pay, but no more, unless I have commodities on board, and then no more than the regular tolls now imposed thereon. Not deeming it necessary to prolong this correspondence, I shall only further repeat my notice, that I shall commence the canal passenger line mentioned in my letter of the 24th ultimo on the 1st day of May next, and I trust no obstacle will be presented by your officers or agents at the canal.

Very respectfully, your obedient servant,

(Signed,)                          JOHN A. PERRINE.

### (*Exhibit No. 5.*)

{ *Philadelphia, Chesapeake, and Delaware Canal Office, April 6th*, 1847.

At a meeting of the Board of Directors of the Chesapeake and Delaware Canal Company held this day, the President laid before the board a copy of a letter addressed by him on the 30th of March, 1847, to John A. Perrine, Esq., of Princeton, New Jersey, in compliance with the resolution of the board or the 30th of March, 1847, and also the answer of Mr. Perrine thereto, dated the 1st instant.

The said letters were read and considered, and that of the President approved. It was then, on motion, resolved, —

That the President instruct the superintendent at the Delaware Tide Lock, on the Chesapeake and Delaware Canal, to permit any vessel of the canal passenger line established by John A. Perrine, Esq., to pass through the canal, if it have goods, commodities, or produce on board, or if empty, on payment of the regular tolls now imposed ; but if the said vessel carry passengers or persons not engaged in the navigation or business of the vessel, or cargo, to require from the master of said vessel the payment of one dollar toll for each passenger, before said vessel passes out of said lock ; and if such payment be not made, or the passengers be not landed from said vessel,

then not to permit it to pass through the canal. And further, to instruct the superintendent, and the officers and agents of the company, to be diligent in requiring any such vessel, if it shall enter or pass through the canal, to adhere strictly to all the existing rules and regulations as to speed and conduct.

Resolved, That the President transmit to Mr. Perrine a copy of the above resolution.

Extract from the minutes.

PETER V. LESLEY, *Secretary.*

### (*Exhibit No. 6.*)

To JOHN A. PERRINE, Esq., Princeton, New Jersey.

> Chesapeake and Delaware Canal Office, Philadelphia, April 6th, 1847.

SIR: — Your letter of the 1st inst. was received and laid before the board. Pursuant to their direction, I inclose a copy of a resolution adopted in relation thereto.

It is proper for me to apprise you, that the instructions therein mentioned have been given to the superintendent at the Delaware Tide Lock, and they will be strictly enforced.

Very respectfully, your obedient servant,

(Signed,)     C. NEWBOLD, JR., *President.*

### (*Exhibit No. 7.*)

To MR. JOHN ASH, Superintendent of the Delaware Tide Lock on the Chesapeake and Delaware Canal.

> Chesapeake and Delaware Canal Office, Philadelphia, April 6th, 1847.

SIR: — I inclose a copy of a resolution this day adopted by the Board of President and Directors, in relation to a canal passenger line established by John A. Perrine, Esq., of New Jersey; you will be particular in enforcing the decision of the board, as contained in this resolution.

Very respectfully, yours,

(Signed,)     C. NEWBOLD, JR., *President.*

In consequence of this action, the complainant, on the 12th of April, 1847, filed his bill in the Circuit Court for the Delaware District, setting forth the preceding facts; and to the end that he might be protected against the acts and doings of the said corporation, and that the right to transport passengers through the said canal, in his said canal passenger line, and in boats and vessels upon payment of the tolls authorized by law upon

the boats or vessels, or upon the goods, commodities, or produce on board thereof, and free from any charge in respect of the passengers transported in said canal passenger line, or on board of the said boats or vessels, might be established by the decree of the court, and the said corporation restrained from preventing the transit of passengers in his said canal passenger line, and from imposing any toll upon it in respect of the passengers on board of the same, or from hindering its free passage with passengers and persons, others than those engaged in the navigation or business of the vessel or cargo, until the said payment in respect of such passengers and persons on board; he prayed for an injunction to restrain the corporation and its superintendent at the Delaware Tide Lock, and its officers and agents, from executing and carrying into effect the resolution of the board, and the instructions issued in pursuance thereof.

The company, on the 3d of May, filed their answer, in which they admitted the facts and proceedings alleged in the complainant's bill, and that the instructions given to their officers would be enforced, in regard to the canal passenger line of the complainant, and any boat or vessel belonging to him: but they denied that either by any provision, terms, or conditions of their charters of incorporation, or by any law, they are or were forbidden, or ought not to have passed the resolution in question, or given such instructions, but, on the contrary, that they are advised that the same are within their franchises, authorities, rights, and privileges granted by or arising under their charters of incorporation, and the acts supplementary thereto, and that they ought not to be restrained from enforcing them, but allowed to do so.

At May term, 1847, the cause coming on to be heard, the following questions occurred: —

1st. Is the canal company entitled to charge the compensation or toll mentioned in the proceedings for passengers on board the complainant's boat passing through the canal?

2d. Has the complainant a right to navigate the canal for the transportation of passengers, with passenger boats, paying or offering to pay toll upon the boats as empty boats, or upon commodities on board, but without toll or compensation for passengers, as proposed in his correspondence contained in the exhibits?

And upon each of these questions the opinions of the judges were opposed.

And thereupon, at this same term, at the request and upon motion of the complainant's counsel, the said points on which

the disagreement has happened, are stated under the direction of the judges, and to be certified, under the seal of this court, to the Supreme Court of the United States, at their next session, to be finally decided.

The case was argued by *Mr. Whiteley*, for the complainant, and by *Mr. Gilpin* and *Mr. Bayard*, for the defendants. It was brought up by the defendants, and therefore opened, by *Mr. Gilpin*, who was followed by *Mr. Whiteley*, and the argument was concluded by *Mr. Bayard*. Nevertheless, the complainant's points will be stated first.

*Mr. Whiteley* made the following points for the complainant : —

First point. There is no provision in the charter of the Chesapeake and Delaware Canal Company, authorizing the company to charge toll or compensation on the passengers in any boat or vessel passing through the canal. 3 Delaware Laws, 170. Collection of Laws relative to Ches. and Del. Canal Co., 9, 10, 25, 26, 27 (attached to bill of the complainant).

Second point. Corporations have only such powers as are specifically granted by the act of incorporation, or such as are necessary to carry into effect the powers expressly granted. 2 Kent's Com. 298; Head and Amory v. Providence Ins. Co., 2 Cranch, 127; Charles River Bridge v. Warren Bridge, 11 Peters, 420.

Third point. The canal having been constructed pursuant to an act of incorporation, passed by the legislatures of Delaware and Maryland, the right of the company to toll is derived entirely from the charter, and is to be considered as if there was an agreement between them and the public, the terms of which are expressed in the act of incorporation; and the rule of construction is, that any ambiguity in the terms of the contract must operate against the corporation, and in favor of the public. The corporation, therefore, can claim nothing which is not clearly given to them by their charter. The Proprietors of the Stourbridge Canal v. Wheeley et al., 2 Barn. & Adolph. 792; Kingston Dock Co. v. La Marche, 8 Barn. & Cress. 42; Charles River Bridge v. Warren Bridge, 11 Peters, 544.

Fourth point. By the incorporation of this company, certain franchises were granted by the public to them, and those franchises were of importance to the public interest. Nothing therefore passes to the corporation by implication. United States v. Arredondo, 6 Peters, 738; Beatty v. Lessee of Knowler, 4 Peters, 168; Providence Bank v. Billings and Pitman, 4 Peters, 514; Charles River Bridge v. Warren Bridge, 11 Peters,

545, 546; Leeds and Liverpool Canal *v.* Husler, 2 Dowl. & Ryl. 556; 1 Barn. & Cress. 424.

Fifth point. The canal is expressly made, by its charter, a "public highway." Collect. of Laws relative to Ches. and Del. Canal Co., 11, 27; Doe dem. of Bywater *v.* Brandling et al., 7 Barn. & Cress. 643.

Sixth point. The use of the waters of the canal is public, though the canal itself is private property; the complainant, therefore, as one of the public, has the right to the use of its waters, subject only to the express restrictions contained in the charter, — the payment of such tolls as the charter authorizes upon the commodities on board of his boats, or the toll fixed by the charter upon empty boats.

Seventh point. That the charter of the said Chesapeake and Delaware Canal Company gives the said company no power to refuse a passage to any vessel through the said canal, except upon refusal or neglect of the captain or owner of any such vessel to pay the toll fixed by the charter. Coll. of Laws relative to Ches. and Del. Canal Co., 11, 26.

The points on behalf of the canal company were the following : —

First point. If conceded that, in cases of ambiguity in legislative grants or charters, the construction should be in favor of the public, yet no forced or extravagant construction in favor of the public can properly create an ambiguity; but a rational and fair exposition should be made, according to the general rules which govern in the exposition of all public statutes. Dwarris on Statutes, c. 11, p. 658; Stevens *v.* Duckworth, Hardres, 344; Rex *v.* Burchett, 1 Shower, 108; Mitchell *v.* Soren, Parker, 233; Sussex Peerage Case, 11 Clark & Fin. 143; Rex *v.* Pease, 1 Nev. & Man. 694; Rowe *v.* Shilson, 4 Barn. & Adol. 731; 1 Nev. & Man. 739; Rex *v.* The Grand Junction Canal Company, 3 Railway Cases, 14; Rex *v.* The Glamorgan Canal Company, 3 Railway Cases, 16; The Provost of Eton College *v.* The Great Western Railway Company, 1 Railway Cases, 220; Barrett *v.* The Stockton and Darlington Railroad Company, 2 Man. & Grang. 134; Hopkins *v.* Thoroughgood, 2 Barn. & Adolph. 921; The Charles River Bridge Company *v.* The Warren Bridge Company, 11 Peters, 589, 598.

Second point. By a fair and just interpretation of the charter of the Chesapeake and Delaware Canal Company, granted by the States of Delaware and Maryland, the public have no right to use the canal for the transportation of passengers, it

being a limited highway by the terms of the grant, and the right of the public to the use of the canal as a highway existing under and by force of the grant alone. The Maryland Charter, § 11; The Delaware Charter, § 10; Maryland Laws, 1827, ch. 207, 1831, ch. 296, § 19; Delaware Laws, 1829, p. 323, 1832, p. 114; Stafford v. Coyney, 7 Barn. & Cress. 257, 260; The Seneca Road Company v. The Auburn and Rochester Railroad Company, 5 Hill, 174.

Third point. The canal is the property of the defendants, subject to the use of the public to the extent prescribed in the charter, but the *jus publicum* is derived from the charter alone, and the right of property remains in the defendants, with all its attributes and incidents, not derogating from the public right; and among those incidents is the right to demand and receive compensation for the use of the property for other purposes than those to which the *jus publicum* applies. 2 Coke's Inst. 220; Hale de Jure Maris, 73, 77; Heddy v. Wellhouse, Moore, 474; Crispe v. Bellwood, 3 Levinz, 424; Rex v. Burslett, 1 Ld. Raym. 149; Northampton v. Ward, 2 Strange, 1238; Rex v. The Mersey and Irwell Nav. Co., 4 Man. & Ryl. 98; Rex v. The Avon Nav. Co., 4 Man. & Ryl. 23, 31, 36; Rickards v. Bennett, 1 Barn. & Cress. 233, 234.

Mr. Chief Justice TANEY delivered the opinion of the court.

The Chesapeake and Delaware Canal connects the waters of the Chesapeake and Delaware Bays, and derives its corporate existence from charters granted by Maryland, Delaware, and Pennsylvania. It passes through the territory of the first two States only; but Pennsylvania was deeply interested in this improvement, and Maryland, it appears, was unwilling to authorize it unless the opening of the navigation of the Susquehannah River was connected with the construction of this canal. Delaware, also, supposed itself to have some demands on Pennsylvania, as appears by the charter it granted. And in order to accomplish the objects which the different States had in view, each of them passed an act incorporating this company, with certain conditions annexed to the respective charters, concerning other objects, thereby making its incorporation a compact between them. The nature of this compact, and the purposes it was intended to accomplish, will be readily understood, from the situation of the navigable waters which this canal was intended to unite, and from the peculiar provisions inserted in the respective charters.

Before this canal was made, the city of Baltimore almost monopolized the trade of the country bordering on the Chesa-

peake Bay, and of the numerous tide-water rivers which penetrate the adjacent country. For, in order to reach Philadelphia, it was necessary to pass by sea from the capes of the Chesapeake to those of the Delaware, and commerce could therefore be carried on only in vessels fit to navigate the ocean. Philadelphia naturally desired to share in the trade thus exclusively enjoyed by Baltimore, by opening a safe and easy inland communication from one bay to the other; and it was evident from the nature of the country, that this could be effected by a canal of about thirteen miles in length, near the head of the Chesapeake Bay.

On the other hand, the interests of Baltimore were adverse to this canal, as it would deprive it of the advantage it then possessed, and it moreover desired to bring to its own port the vast productions of the country watered by the Susquehannah, which flows into the Chesapeake Bay at its head. But this river was obstructed by rocks, and the trade was for the most part carried on over land with Philadelphia; and these obstructions could not be removed without the consent of Pennsylvania, as some of the most serious impediments to navigation were within the limits of that State, a little north of the Maryland line.

The respective States naturally felt it their duty to foster their respective cities, as far as justice and the interests of the community, generally, would permit. Pennsylvania, therefore, would not agree to remove the obstructions in the Susquehannah, unless the canal was authorized to be made; nor would Maryland authorize the canal, unless the trade of the Susquehannah was laid open to Baltimore. But neither State was disposed to sacrifice the interests of its citizens to the rivalship of the cities, and both were sensible of the advantages arising from the general extension of commercial intercourse, and were, it appears, willing that these two important avenues of trade should be opened at the same time.

The provisions of the charters of the different States show the particular interests which they respectively desired to protect, and the objects they proposed to attain by mutual coöperation.

The first act incorporating this company was passed by Maryland in 1799. The last section is in the following words:—

"Provided, that this law shall be of no force or effect until a law shall be passed by the State of Delaware authorizing the cutting the canal aforesaid, and until a law shall be passed by the Legislature of Pennsylvania declaring the River Susquehan-

nah to be a highway, and authorizing individuals or bodies corporate to remove obstructions therein, at a period not exceeding three years from the 1st day of March, 1800."

The charter from Delaware was obtained in 1801. In the clauses upon which the canal company relies, to maintain its claim in this controversy, the act of the Legislature of Delaware is in the same words with the act of Maryland, and, like Maryland, it annexed to its charter certain conditions, which it required Pennsylvania to fulfil before the act of incorporation should take effect. But it is unnecessary to state them particularly, as they have no reference to the canal or the river, and relate to subjects entirely distinct from the navigation which these improvements were intended to open.

In 1801, a few weeks after the act of Delaware was passed, Pennsylvania also incorporated this company, and in the same law declared the Susquehannah to be a public highway, and authorized the removal of the obstructions in it, as demanded by Maryland, and complied also with the conditions required by the charter from Delaware. The act of incorporation of Pennsylvania adopts the Maryland charter; and after having done so in general terms, it adds the following words : — "And shall derive no other powers under this act but such as are set forth in the said act of the Legislature of Maryland, or necessarily incident to a corporation."

As we have already said, the canal does not pass through any part of the territory of Pennsylvania, and consequently there was no necessity for a charter from that State to authorize a company to construct the work. All that was required of her was a compliance with the conditions annexed to the charters of the two other States. But as the city of Philadelphia was chiefly interested in this improvement, and the interests of Baltimore adverse, it was evident that subscriptions for the stock were to be looked for in the former, and not in the latter ; and that it would be essential to the success of the enterprise, that its managers should be members of the community which favored it, and the board hold its sessions and transact its business amongst them. A charter from Pennsylvania was necessary to attain these objects, and thereby give assurance of the ultimate success of the work.

But a charter from Pennsylvania was necessary for another object still more important. The Susquehannah was to be a public highway, and this canal was intended to be equally free and open, subject only to the tolls to which the State had assented. And if this company should afterwards, under the sanction of Maryland, be permitted to exercise powers beyond

those specified in the charter, or impose tolls and burdens not therein enumerated, the navigation of the canal might be seriously obstructed, or so heavily burdened as to give to Baltimore, exclusively, not only the trade it then monopolized, but also that of the Susquehannah when the river should be opened. It was deemed, therefore, advisable by Pennsylvania, to combine with its assent to the Maryland condition an act incorporating the company, in order that it might derive its corporate existence from the three States, and its charter become a compact between them, which neither could alter without the consent of the other. Hence the insertion of the particular provision above mentioned in the Pennsylvania law, the object of which is not merely to assert a general and familiar principle in the construction of acts of incorporation, but to place it out of the power of the other States to enlarge the privileges of the corporation, or increase the burdens of the transit through the canal, without the consent of Pennsylvania.

The interest of that State certainly required that the canal, upon the payment of the stipulated tolls, should be free for all the purposes for which the Susquehannah was declared to be a public highway. The opening of the river and the construction of the canal were correlative improvements and portions of the same line of navigation, and there could be no reason of justice or policy for stopping at the canal the passengers who came down the Susquehannah on their way to Philadelphia. Whether they are made liable to toll, or not, must of course be determined by the language of the charters. But the interest and policy of Maryland and Pennsylvania undoubtedly required that their citizens should have a right to pass through. And if the corporation may refuse that permission to passengers, the line of communication, which was manifestly intended to be opened throughout to the same description of intercourse, may be inconveniently interrupted, and the policy of the States, and especially that of Pennsylvania, disappointed to a serious extent. The evil will not be lessened if the corporation is authorized to exact toll from passengers, and the amount left altogether to its own will and pleasure.

With this view of the general object and policy of these laws, we proceed, in the first place, to inquire whether the language used in them, according to its true and legal construction, gives to the corporation the right to demand toll from passengers who pass through the canal, or from vessels on account of the passengers on board.

This question may be disposed of in a few words. The articles upon which the company is authorized to take toll are

particularly enumerated, and the amount specified.  The toll is imposed on commodities on board of a vessel passing through the canal.

No toll is given on the vessels themselves, except only when they have no commodities on board, or not sufficient to yield a toll of four dollars.   Passengers are not mentioned in the enumeration, nor is any toll given upon a vessel on account of the persons or passengers it may have on board.

Now it is the well-settled doctrine of this court, that a corpo-ration created by statute is a mere creature of the law, and can exercise no powers except those which the law confers upon it, or which are incident to its existence.   Head and Amory *v.* The Providence Ins. Co., 2 Cranch, 127; Dartmouth College *v.* Woodward, 4 Wheat. 636; Bank of the United States *v.* Dandridge, 12 Wheat. 64; Charles River Bridge *v.* Warren Bridge, 11 Pet. 544; Bank of Augusta *v.* Earle, 13 Pet. 587. And as no power is given to this corporation to demand toll from passengers, or from vessels on account of the passengers on board, it is very clear that no such power can be exercised, and no such toll lawfully taken.

The principle above stated is also an answer to the argument which places the right of the company to demand toll upon the ground that it is the absolute owner of the works and of the land it occupies, and insists that it may therefore, like any other owner, demand compensation from any person passing over its property.   The error of this argument consists in re-garding the title of the company to the property in question as derived to them upon common law principles, and measuring their rights by the rules of the common law.   The corporation has no rights of property except those derived from the provis-ions of the charter, nor can it exercise any powers over the property it holds except those with which the charter has clothed it.   It holds the property only for the purposes for which it was permitted to acquire it, — that is, to effectuate the objects for which the Legislature created it.   And whether it may lawfully demand compensation from a person whom it permits to pass over its property must depend upon the lan-guage of the charter, and not upon the rules of the common law.

Certainly in this instance the power is not conferred in ex-press terms, nor are any words used from which it can reasona-bly be implied.   It would, indeed, be a most unusual one, and we believe without precedent in any charter heretofore granted by any State in this Union.   For the power claimed is the right to demand toll from every citizen who passes through the

canal, and to fix the amount at the discretion of the corpora-
tion.    In form, it is true, the demand is made on the owner of
the vessel engaged in transporting passengers; but it is imma-
terial to the passenger whether he is charged with the toll in
the increased price of his passage, or by a direct tax upon him-
self.    In either case the result is the same, and the power exer-
cised is the same.    Such an unlimited power to levy contribu-
tions on the public, and one so inconsistent with the ordinary
course of legislation upon that subject, and, we may add, so
unjust and injurious to the public, ought not to be sustained in
a court of justice, unless it is conferred in plain and express
words.    It should not be inferred where the slightest doubt
could arise, and the words are capable of any other construc-
tion; and still less can it be inferred in a charter like this,
where the toll granted upon goods and property of every kind
is so carefully specified and fixed in the law, and the charter
altogether silent in relation to passengers.    The contrary infer-
ence would seem to be irresistible.

We proceed to the examination of the second question certi-
fied.    This point has been strongly pressed upon the court, and
the argument on the part of the canal company has addressed
itself chiefly to the case of passenger boats, without com-
modities or goods on board.    But it is evident that the point
must resolve itself into this, — Can they refuse permission to a
boat laden with merchandise to pass through the canal, provid-
ed it has a passenger on board, and refuses to put him out.
For so far as the right to pass through the canal is concerned,
there is no distinction in the charters between passenger ves-
sels and freight vessels, nor between vessels with a single pas-
senger, and one with a multitude of passengers; nor between
vessels with both cargo and passengers, and vessels with passen-
gers only.    The acts of incorporation make no distinction be-
tween either of these classes of boats, and we therefore can
make none; and if the power claimed for the corporation exists
as to one class, it must exist as to all.

The clauses mainly relied on by the counsel for the com-
pany are the ninth and eleventh sections of the Maryland
charter, the language of these sections being adopted in the
charters of the two other States.    The ninth specifies the tolls
which the company may demand, and after enumerating most
of the principal and usual articles of inland commerce, and
graduating the toll on some of them according to the quantity
on board, and on others according to the weight, it concludes the
enumeration in the following words: —

" And for all other commodities the same proportion, agree-

16 *

able to the articles herein enumerated, and every boat or vessel which has not commodities on board to pay the sum of four dollars shall pay so much as, with the commodities on board, will yield the sum aforesaid, and every empty boat or vessel four dollars, except an empty boat or vessel returning whose load has already paid the tolls affixed, in which case she shall repass toll free, provided such boat or vessel shall return within fourteen days after paying said tolls."

Upon a fair construction of the language of this section, we think that this canal was intended to be a public highway, and that every boat or vessel suited to its navigation was to be at liberty to pass through, upon the payment of the tolls therein specified.   And if nothing was on board upon which toll could be demanded, it still had a right to pass, upon payment of the toll imposed upon the vessel.   And this construction becomes the more evident when this section is taken in connection with the one next following (the tenth), which authorizes the collector of the tolls to refuse passage to a vessel neglecting or refusing to pay " the toll " at the time of offering to pass. The words " the toll " in this section plainly and necessarily refer to the tolls enumerated in the preceding one.   The refusal to pay them is the only case in which a power is given to stop the boat.   And as no toll is given on passengers, or on the vessel on account of its passengers, it follows that a passage could not be refused to a vessel on account of its passengers, because there could be no refusal to pay the toll authorized by law ; and the right to refuse the vessel being given in one specified case, and in none other, it is an implied restriction of the right to the particular case provided for.

But it is said that the right of the public to use the canal as a highway is restricted by the eleventh section, and confined to vessels engaged in the transportation of goods, commodities, and produce.   The material words of that section are as follows : —

" That the said canal and the works to be erected thereon in virtue of this act, when completed, shall for ever thereafter be esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities, or produce whatsoever, on payment of the toll imposed by this act."

It is insisted, on the part of the corporation, that the words " free for the transportation of all goods, commodities, and produce whatsoever," restrict the words which make it a highway, and limit the privileges of the public, to the transportation through it of goods, commodities, and produce.

But this construction can hardly be maintained, upon any

just rule for the interpretation of statutes. It would be inconsistent with the clause in the ninth section, hereinbefore set forth, which authorizes the passage of vessels which have no commodities on board. This construction would confine the right to those actually engaged in the transportation of goods. And if the canal was to be a highway for goods, commodities, and produce only, the privilege of the vessel would be derived altogether from the goods, and consequently a vessel without goods might be refused a passage, notwithstanding the express provision that she shall be entitled to go through. An interpretation of the statute which would lead to this result, and render different sections inconsistent with each other, cannot be the true one. The error consists in treating words, which were intended as a limitation of the powers of the corporation, as a restriction upon the rights of the public. In the opinion of the court, the words in question were intended to guard against the exaction of other or higher tolls than those given by the law, and not to restrict the right of passage. The clause in question declares that the canal shall be free for all goods, commodities, and produce whatever, upon payment of the toll *imposed by law;* meaning obviously, that no other or higher toll should be demanded. They were not intended to restrict the provision immediately preceding, that the canal should be a highway, but more effectually to secure the right of the public by restricting the toll to be demanded to the toll *imposed by the act.* They were introduced like the provision in the charter from Pennsylvania hereinbefore mentioned, which prohibits the company from exercising any powers but such as are set forth in the charter, or necessarily incident to a corporation. Neither of these provisions was necessary, but they were introduced as measures of precaution, to guard against strained and forced inferences, which the desire of gain might induce the corporation to make, injurious to the rights of the public, and contrary to the intention of the Legislature. The right claimed by this corporation, therefore, can find no justification in the language and provisions of the sections relied on in the argument. It can find as little support from the general and known usages of trade and travel, at the time it was incorporated.

It is true that, when these charters were granted, travelling by water was inconsiderable and unimportant compared with what it now is, and nobody anticipated the immense increase which the invention of steam navigation has produced. But it is equally true, that, in every country where traffic and trade have been carried on by water, it has been the custom of ves-

sels engaged in the transportation of merchandise to carry pas-
sengers, and to have vessels thus engaged fitted in many in-
stances with better accommodations than others, in order to in-
duce travellers to take passage in them, and thereby increase
the profits of the navigation in which they were engaged. In
Maryland, with its broad bay, its great number of navigable tide-
water rivers interrupting travel by land, its numerous villages
and towns on their banks, and its commercial metropolis seated
at the head of the bay, it cannot be doubted that this usage
prevailed extensively, and that vessels engaged in the trans-
portation of produce or merchandise, or returning empty from
market, habitually carried passengers, from whom they received
a compensation. And a large portion of the members of the
Legislature who voted on this charter, and who represented the
counties on the Eastern Shore of Maryland, must have been in
the habit of coming to the seat of government by water, and as
passengers on board of a vessel, engaged either in the trans-
portation of merchandise, or merely in the transportation of pas-
sengers. The Legislature, therefore, in incorporating this com-
pany, certainly acted with a full knowledge of this usage, and
the general custom of travelling by water. Can it, then, be sup-
posed, that, in opening this new communication, they meant to
authorize the company to interdict the passage of its citizens as
passengers through the canal? that, without any imaginable
motive, they should deprive the public of the cheapest and
most convenient mode of passing from the Chesapeake Bay to
the city of Philadelphia? and that, while they took so much
pains to make the canal a highway for property from any part
of the United States, they yet authorized the company to shut
it against persons, although those persons were citizens of their
own State? We see nothing in the law that can justify the
court in imputing to the Legislature such an object. It would
be so utterly inconsistent with the policy of the States, and
such an unnecessary and uncalled for interference with the
habits, usages, and convenience of their citizens, that such an
intention ought not to be inferred from obscure or doubtful
words. But we see nothing that can be regarded as doubtful
or obscure, in relation to this subject; on the contrary, it is
clear that every vessel suited to the navigation of the canal is
authorized to pass through, upon the payment of the toll *im-
posed by law.* There is none imposed by law on persons or
passengers. And there is no distinction in the charters between
vessels with or without passengers.

It is very possible, indeed, if the improvements in steam nav-
igation could have been foreseen, and the great increase of

Perrine v. Chesapeake and Delaware Canal Co.

travel and intercourse it would produce, that the Legislatures of the States might in some form or other have allowed a toll with reference to passengers, as a compensation for the facilities afforded by the canal. But it is not the province of this court to enlarge the powers of a corporation beyond the limitations of the charter, because circumstances have changed. Our province is to expound the law as it stands, not to determine whether larger powers would not have been given if the Legislature had anticipated events which have since happened. Besides, the question we are now discussing is not whether the company is entitled to demand toll from passengers or not, but whether it may refuse them passage through the canal. We have already shown, in a previous part of this opinion, that, upon well-settled principles for the construction of charters, as established by the decisions of this court, and uniformly acted on, the company are not entitled to take toll from passengers. And not being authorized to receive toll, we are now inquiring whether it may deny them the right to pass through. The unexpected increase of travel would certainly be no reason for clothing it with this power. It would rather be a reason for withholding it. For whatever ground there might be in the present state of things to induce the Legislatures of the States to allow some toll on account of passengers, it can be no reason for denying them the liberty to pass; since the increased number of travellers would make the refusal more extensively felt than at the time the charters were granted.

The word "empty" in the ninth clause of the charter, hereinbefore set out, has been commented on and some stress laid upon it. It is said that the right of passage is given only to vessels with commodities on board, or empty vessels; and that, as a vessel full of passengers cannot be said to be empty, the right of passage is not given. Certainly a vessel full of passengers cannot be said to be empty of passengers. But the charter does not speak of a vessel empty of passengers, but empty of goods; that is, without cargo. Looking at the word as it stands in the law, and the provision with which it is associated, its true sense cannot be mistaken. The section declares that every vessel, not having commodities on board sufficient to pay the toll of four dollars, shall pay so much as, with the commodities on board, will yield that sum, and every empty boat or vessel shall pay four dollars. The word "empty," as here used, evidently means without cargo. The law is speaking of cargo, and of cargo only, and not of persons or passengers. In its broadest sense, a vessel is not perfectly empty when she has a crew on board, or ballast, or the ordinary supplies for the crew.

But we cannot take out of a statute a single word susceptible of different meanings, and expound it without reference to the context, and without any regard to the subject-matter of which the legislature is speaking, or to the provisions and language with which it is associated. The rules for the construction of statutes in this respect are familiar and well established, and cannot at this day need argument or illustration. The meaning of the word, when it is susceptible of different interpretations, must be determined from the context, and the subject-matter of which the law-makers are speaking. If a different rule were adopted, the court would in most cases defeat the intention of the legislature, instead of performing its legitimate office of carrying it into execution. In the case before the court, the word "empty" must be separated from the context, and applied to a subject of which the Legislature is not speaking, and which does not appear to have been in its mind at the time; that is, to passengers instead of merchandise, in order to deduce an argument from it in support of the power claimed by the corporation.

Besides, the corporation does not place its defence, nor does it claim the right to refuse a passage to the vessel, upon that ground. The right it insists upon in its answer and resolutions is, the absolute and unqualified right to refuse a passage to a vessel with passengers, whether she has a cargo or not, and whether she has a single passenger or a multitude. And this, indeed, is the true and only question that can be in controversy. For there is no justification whatever to be found in the law for taking a distinction between a single passenger and many passengers, or between passengers in a vessel full of cargo, and a vessel entirely without cargo and engaged in the passenger trade. If a passage through may be refused in one of these cases, it may be in all. Nor does the company claim that there is any distinction between passenger vessels and vessels intended for the transportation of goods. For it admits, in its correspondence with the complainant, that his vessel, although described as a passenger vessel, would be entitled to pass, provided he first landed his passengers, or would pay the toll on them demanded by the company. The right it claims relates only to persons on board, and not to the character, or pursuits, or objects of the vessel.

Indeed, if the right claimed by the company turned upon the construction of the word "empty," and the meaning suggested in the argument could be maintained, the dispute would be of very little importance, in point of emolument, either to the corporation or the navigator. For almost every vessel engaged in

Perrine *v.* Chesapeake and Delaware Canal Co.

the transportation of passengers would usually, upon this line of navigation, have on board some article liable to toll. And if she had any cargo, however small, she would not pass as an empty vessel, but as a vessel with commodities on board, and be liable as such to pay so much as would make up the amount of toll imposed by law. If the power of the company to prohibit, therefore, is confined to vessels entirely without cargo, it would be of no great importance to them. But there is so little foundation in reason, in policy, or in the language of the law, for making a distinction between a vessel with a single box or bale of goods, and one without any, that no one, we presume, will seriously contend for it. Certainly the company relies upon no such distinction. It claims the right against all passenger vessels, whether they have cargo on board or are empty of cargo.

Nor do we think that any force can be given to the argument, that the transportation of passengers might require so much of the water of the canal as to destroy its usefulness in the transportation of produce. The supply demanded for a vessel with cargo would not be enhanced by the passengers on board. Nor would she be entitled to increase her speed on that account, so as to injure the banks of the canal. Nor can the scarcity or abundance of water influence the construction of the charter. But a conclusive answer to this argument is, that no such objection appears in the record. There is no evidence upon the subject, and the company, in its answer to the complainant's application, suggests no difficulty in the supply of water, nor that there is hazard of interruption to the transportation of produce on the canal, or danger to its banks. Indeed, they give the complainant to understand, that they are entirely able to comply with his proposal, and say that they will pass his boat through if he will land his passengers or pay toll upon them. They refuse upon the ground that they are entitled to toll, and place their defence on no other.

There is nothing in the record to show when this right was first claimed by the company, nor whether it is a new one recently thought of, or one which the company claimed and exercised from the time the canal went into operation. Evidently, it was not the construction given to the charters, either by the Legislature or the corporation, while the work was in the course of construction. For while it was in progress, subscriptions to the stock were proposed by Maryland and Pennsylvania, by laws reciting the advantages which this canal would afford to the United States, in transporting inland its armies and munitions of war. These recitals show that persons as well as

property· were .to pass through, and that it was expected to be a ·convenience for the transportation of persons, as well as of property.

Upon the whole, therefore, ·whether we look to the obvious policy of the compact between the States, under which this work was constructed, as indicated by their respective charters, or to the general and established usages of inland navigation at the time the charters were granted, or to the language of the several acts which define the powers of the corporation, we see no ground for maintaining the right now claimed. And this decision would be the same if the rule of construction in relation to corporations was reversed, and every intendment was to be made in favor of the corporation and against the public. For if we gave to the charters the most liberal interpretation in favor of the company, yet there is nothing in them which even upon this principle could, in the judgment of this court, bear the construction insisted on by the canal company, nor confer the powers which it claims to exercise.

But the rule of construction in cases of this description, as recognized by this court in the case of the Charles River Bridge *v.* The Warren Bridge, is this, — that any ambiguity in the terms of the grant must operate against the corporation and in favor of the public, and the corporation can claim nothing that is not clearly given by the law. We do not mean to say that the charter is to receive a strained and unreasonable interpretation, contrary to the obvious intention of the grant. It must be fairly examined and considered, and reasonably and justly expounded. But if, upon such an examination, there is doubt or ambiguity in its terms, and the power claimed is not clearly given, it cannot be exercised. The rights of the public are never presumed to be· surrendered to a corporation, unless the intention to surrender clearly appears in the law.

The questions before us are of high importance to the community, and they are emphatically questions between the rights of the public and the powers of the corporation. The privilege of making this canal, and of receiving tolls upon it, was granted by the States without any compensation to the public but the convenience it was expected to afford. The States, as well as the United States, have contributed to the expense of its construction. And the court is called upon to decide whether the States who chartered this company have authorized it to exact any amount of toll it may think proper from their own citizens, as well as others, for the privilege of· passing over it; or may, if such be its interest or policy, refuse altogether the permission to pass.

In the opinion of the court, the charters do not confer either of these powers upon the corporation, and we shall certify accordingly to the Circuit Court.

Mr. Justice McLEAN, Mr. Justice NELSON, and Mr. Justice WOODBURY dissented.

Mr. Justice McLEAN.

This, like all other and similar corporations, has its rights and privileges defined in its charter, and also the duties imposed upon it. The eleventh section provides, " that the said canal and the works to be erected thereon in virtue of this act, when completed, shall for ever thereafter be esteemed and taken to be navigable as a public highway, free for the transportation of all goods, commodities, or produce whatsoever, on payment of the toll imposed by this act " ; " and no toll or tax for the use of the water of the said canal, and the works thereon erected, shall at any time hereafter be imposed by all or either of the said States."

By the ninth section, a great number of articles are specified, for which the company is authorized to charge certain rates of toll, " and for every gross hundred weight of all other commodities or packages ten cents, and for all other commodities the same proportion, agreeable to the articles herein enumerated ; and every boat or vessel, which has not commodities on board to pay the sum of four dollars, shall pay so much as, with the commodities on board, will yield that sum ; and every empty boat or vessel four dollars, except an empty boat or vessel returning, whose load has already paid the tolls affixed, in which case she shall repass toll-free, provided such boat or vessel shall return within fourteen days after paying said tolls."

And the tenth section declares, " In case of refusal or neglect to pay the toll at the time of offering to pass a vessel through the canal, the collector shall have the right to refuse a passage."

The defendant claims the right to run a line of packet-boats for passengers, to connect with steamboats at the termini of the canal ; and the following questions are stated for our decision.

First, Is the canal company entitled to charge the compensation or toll mentioned in the proceedings, for passengers on board the complainant's boats passing through the canal ?

Second, " Has the complainant a right to navigate the canal for the transportation of passengers, with passenger boats, paying or offering to pay toll upon the boats as empty boats, or upon commodities on board, but without toll or compensation for passengers ? "

I think the first question must be considered in the negative, that the company have not the right to tax passengers one dollar each, or any other sum, for passing in a boat on the canal. They have no special authority to tax passengers in the act of incorporation, and, consequently, they cannot exercise any powers as a corporation except those which are given in the act.

I answer the second question also in the negative, that the complainant in the Circuit Court has "no right to navigate the canal for the transportation of passengers, with passenger boats, paying toll as for empty boats." The charter does not require this of the company, and the public can make no exactions upon the company, as accommodation, which the law does not impose upon them as a duty. The rights of the public and of the company must be determined by a construction of the charter.

What rights are reserved in the charter to the public? The eleventh section, above cited, declares the canal shall "be taken to be navigable as a public highway, free for the transportation of all goods, commodities, or produce whatsoever, on payment of the tolls imposed." The right of the public then is, to use the canal for the purposes stated, "on paying the tolls imposed." Does the right extend beyond this? It does not, in my judgment, if the section be construed by any known rule of construction.

This was the contract made with the company by the public. And is it not as binding on the one party as the other? The right on both sides is founded in contract. The company agreed to construct the work, and keep it in repair, on the conditions stated. Can these conditions be changed at the will of either party? If the public can make exactions beyond the charter, there is an end to chartered rights.

The right of transportation on this canal is given to the public, on the payment of toll, and without the payment of toll there is no such right. A boat returning empty, "whose load has already paid the tolls," is not charged. But an empty boat, under other circumstances, is charged four dollars. If it have commodities on board which pay less than four dollars, the boat shall be required to make up that sum. And here is the whole extent of the right of the company to exact toll, and of the right of the public to use the canal.

The conveyance of passengers was not provided for in the charter. The transportation of the commodities specified, and the passage of empty boats, were the only obligations, in this respect, imposed on the company. But a majority of my

brethren have implied a right in the defendant to transport passengers without the payment of toll. The baggage of the passengers, if they have any, may be charged as commodities, but the owners of the baggage are as nothing; they are non-entities while on board the packet passenger boats on this canal; in fact, within the meaning of the charter, the boats are empty. This would seem to me to be rather a strained construction. I cannot persuade myself that the law-makers, when they authorized a tax of four dollars on an empty boat, intended to include a boat full of passengers.

We know that passenger boats afford a better profit than freight boats; and every one knows, from the more rapid movement of the former, they do more injury to the embankments of a canal than freight boats.

But it is asked in the argument, if a freight boat can be refused a passage if it have one passenger on board. Every boat must have hands on board of it to take care of the cargo and navigate the boat. And it is presumed that a strict inquiry is rarely, if ever, made as to a single passenger on board. But I submit that this is no test of the principle involved. The right asserted is to run a line of packets exclusively for the accommodation of passengers. This will impose a duty, and a most onerous one, on the company, which, I think, is not within their charter.

If a canal-boat must be construed and taxed as empty, which is not laden with the commodities specified, I know not how deeply it may affect our internal navigation. All these questions are of great importance, and should not be influenced by presumed notions of policy. They are matters of right, as they may affect corporations, arising under contract.

Should the transportation of passengers be desirable to the company, they could, no doubt, by application to the legislative power, obtain a modification of their charter, in this respect, that shall be just to them and advantageous to the public. But as the present charter imposes no obligation on the company to transport passengers on the canal, and does not authorize them to charge a toll for such a service, this court have no power to require from them such a duty. It is not our province to make contracts, but to construe them. But this maxim, universally admitted, could give no security to chartered rights, if, by judicial construction, they may be made to include a service not expressed nor fairly implied.

It is well settled, that, where the law does not authorize toll, it cannot be charged. This is admitted and sustained by a majority of the court; and this necessarily, I think, exonerates the

company, where there is no express provision in the .charter, from doing that for which they can receive no compensation. It is an inference as unsound in logic as it is in law, that the transportation of passengers, though not required by the charter, must be permitted by this company, without charge, as they have no power to tax them. And this, it seems, is the only duty required from the company without compensation.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circurt Court of the United States for the District of Delaware, and on the points or questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, — 1st. That the canal company is not entitled to charge the compensation or toll mentioned in the proceedings for passengers on board the complainant's boats passing through the canal ; and 2d. That the complainant has a right to navigate the canal for the transportation of passengers with passenger boats, without paying any toll on the passengers on board, upon his paying or offering to pay the toll prescribed by law upon the commodities on board, — or the toll prescribed by law on a vessel or boat when it is empty of commodities. Whereupon it is now here ordered and decreed, that it be so certified to the said Circuit Court.